## LESTER JAMISON et al. v. STATE.

No. A-8972. March 27, 1936.

(56 Pac. [2d] 905.)

Utterback, Stinson & Utterback, for appellants.

Mac Q. Williamson, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DOYLE, J. Appellants, Lester Jamison and Boots Jamison, were jointly charged, tried, and convicted in the district court of Bryan county of the crime of larceny of livestock. The charge was the larceny of one roan heifer and one red cow, the property of S. K. McManus, and it was alleged to have been committed in said county

on or about the 5th day of May, 1934. A trial was had May 23, 1935, resulting in a verdict finding the defendants guilty as charged in the information, but the jury were unable to agree upon the punishment. Motion for new trial was duly filed, overruled, exceptions saved, and on May 25, 1935, the court pronounced judgment and sentenced each defendant to confinement in the penitentiary for a term of two years.

The errors assigned are that the verdict of the jury is not supported by the evidence and is contrary to law, and that the court erred in overruling the motion for a directed verdict of acquittal.

S. K. McManus testified:

"I live at Utica, engaged in farming and stock raising, I am the owner of the cow and heifer described in the information. In the fall of 1935, I had them on the Star place, seven miles southwest of Utica; at that time I lost 23 head, including this red cow and this roan heifer; I missed them in December, and found them in Lester Jamison's pasture May 27, 1934; my brand is (K); each had my brand on the left foreshoulder; the cow had smooth horns; when I found them the cow had been dehorned; the brand was changed to an R; it had been rerun and the hide was coming off; the brand on the heifer was in the same shape; I found the cattle in Lester Jamison's pasture, which is about a mile and half from where the cattle had disappeared; the heifer had her horns cut off the same as the red cow."

That he never did consent to the removal of the cow and heifer from his pasture, or consent to have them placed in any other person's possession.

Newt Eubanks testified:

"I live down close to Utica; I first saw these two animals in my pasture winter of 1933. They stayed in my pasture until about the 15th of April; they were each branded a K on the left shoulder; the cow had nice horns and the heifer had horns an inch and a half or two inches long; they went out of my pasture into Mr. Dollars' place, and stayed there a day or two; about that time I had a conversation with Boots Jamison at Mr. Dollars' place; Alberta Scott and W. W. Dollars were present. Some one asked if we found the owner of the cow. Mr. Dollars said there was some fellow that thought she was his. Boots Jamison and Alberta Scott went to my pasture; they called us and we went down there; they asked us if that was the cow, we told them 'Yes'; they said, 'You don't see no brand on that cow?' I said, 'I haven't noticed the cow to look for the brand,' and they said, 'There it is, it is a K.' I said, 'Yes, I can see it now.' Boots said it was McManus' cow, and I made the remark that I would turn her back out of the pasture; he said, 'I wouldn't do it, you leave her in there, because McManus really don't know he has got that cow or don't know nothing about her, and I would leave her in here.' He said a man could take the K and make an R out of it and dehorn the cow and put her in the pasture and keep her until the hair grew over and McManus would never know her. I said yes that would change her looks considerably. And Alberta said he wouldn't do that for eight or ten of the damned things. I also saw the heifer there at that time; they disappeared that day or the next day. A week or two later I saw the cow in Luther Jamison's pasture; he is the father of Lester Jamison and Boots Jamison; at that time the cow had worms in the head; she had been dehorned and the brand was changed and made an R; it was a fresh rerun brand; the little horns had been cut off the heifer."

Vogal Eubanks testified:

"This cow and heifer were in our pasture from December up until April of last year; I saw them almost every evening; missed them in April; about the last of

April I saw them in Lester Jamison's pasture; they both had been dehorned; the K brand had been changed to an R and the brands were fresh."

J. W. Stallings testified that he was a deputy sheriff, had been notified by Mr. Rockley that he had a cow missing and went to Lester Jamison's pasture either April or May and saw the red cow and the roan heifer.

"I was looking for the Rockley cow; we roped the red cow and she had a K brand on the left shoulder and had horns; later I saw this cow in the same pasture; she had been dehorned and had a fresh brand R."

On the part of the defendants, J. E. Rockley testified that some time about April 1, 1934, he had a conversation with Lester Jamison. Lester said:

" 'There is a cow down there branded R with a bar'; I said, 'It must be mine then'; I some time put the R on and not put the bar on; I have got an R register. I never did see the cow said to be in dispute until this morning. This cow was dehorned; my cow had a heavier set of horns and I could not tell whether it is my cow or not."

W. W. Dollars testified:

"I first saw the cow and yearling involved in this action along after Christmas, they were in my pasture two or three months, sometime during the month of March or April, Boots Jamison and Alberta Scott came to my house and called me out, I had been talking about who the cow belonged to, and they told me the cow belonged to McManus, and showed me the brand on the cow. The cow had horns and a K brand on the left shoulder. The cow had been coming up regularly every night, but did not come up that night nor the next morning; that day I found the fence torn down in one place."

The defendant Lester Jamison testified:

"A red cow and a red roan heifer came in my pasture; the cow had her horns off when she came there; I did not

change the brand on the cow nor on the yearling; had nothing to do with branding the cow or yearling in any shape, form, or fashion; they were in the condition when I first saw them. The cow came up late one evening with my milk cow and one of Mr. McManus' Jersey steers. I went to Albany to have a hog contract fixed up. I asked Mr. Stallings about fixing up my papers, and asked him where was Mr. Rockley, he said, 'In the shop.' I called Mr. Rockley out and said, 'I got one of your cows and a yearling up in my pasture.' He said, 'What description?' I said, 'Red cow.' He says, 'I have got one gone, about how large is the calf?' I told him. He says, 'I guess they are mine, I thought she got drowned.' I said, 'There is one up there, I don't know whose it is, I thought it was yours and your brand on it.' He says, 'I will come up and see about it.' A couple of weeks later he with Mr. Stallings came up there; I was not there; I never did claim ownership of the cow or the yearling."

Cross-examination he was asked: "Did you and Alberta Scott and Boots take the cow out and doctor her for screw worms?" And answered: "A. No, sir, I doctored her head when she came in my pasture."

Boots Jamison testified:

"I had a talk on the 15th day of April, 1934, with Mr. Eubanks and Mr. Dollars, Alberta Scott was there, I did not make any statement to Mr. Eubanks or Mr. Dollars about changing, running or altering the brand on that cow or the yearling. Alberta Scott had some hogs gone and asked me to go to Mr. Dollars' place with him to see about the hogs, we went down by the pasture, there stood this cow, I noticed this K brand, I knew the cow, because I had milked her a year before that; McManus had turned this cow over to me to milk. I hollered to Mr. Dollars and he and Eubanks came down. I said, 'Don't you see this K there?' he said, 'Yes, I do now.' I said, 'This is Sede McManus' cow.' He said, 'If you see Sede tell him she is here.' "

On cross-examination he stated:

"I saw the cow in Lester's pasture after it was dehorned and the brand changed. I did not tell Lester whose cow it was. I did not know whose it was; she came up with my milk cow; I noticed she had worms in her head and I doctored her, but I did not recognize her that time."

In rebuttal, S. K. McManus testified that he never did at any time let Boots Jamison have this red cow to milk; that a year before he bought this cow and calf he let Boots Jamison have a brown muley Jersey cow to milk.

The record shows that when the state rested the defendants interposed a demurrer to the evidence for the reason that the same fails to sustain the allegations of the information.

At the close of all the evidence, counsel for the defendants moved the court to direct the jury to return a verdict of acquittal for the reason that the evidence is insufficient to sustain the allegations of the information.

It is earnestly insisted by counsel for appellants, who, by the way, did not participate in the trial of this case in the court below, that the evidence is insufficient to show a felonious taking of the livestock in question with a felonious intent to deprive the owner of the same and to convert the same to the taker's own use. That the only incriminating circumstances against the defendant Lester Jamison was the fact that the stolen cattle were found in his pasture, and that the only incriminating evidence against the defendant Boots Jamison was that he had remarked that the brands on the cow and the heifer which were stolen could easily be changed and the horns removed, then it would be difficult for the owner, S. K. McManus, to recognize them.

On the part of the state, it is insisted that the incriminating facts and circumstances, together with the inferences logically following therefrom, are incapable of explanation consistent with the innocence of either defendant.

The evidence upon which the defendants were convicted was of an entirely circumstantial nature. We think that it was clearly a question of fact for the jury to determine whether these animals were stolen from the Dollars' pasture and taken into the Jamison pasture and there dehorned and the brands altered in such a way as to amount to an effort to destroy the identity of the cattle as those belonging to S. K. McManus. All of this was done without the knowledge or consent of the rightful owner of the property. It also appears that no effort was made to notify said owner of the fact that his cow and heifer were in the Jamison pasture.

Where the evidence is circumstantial, and the circumstances are such as to reasonably justify the inference of guilt, the weight and value of such testimony are exclusively for the jury. It is only where the evidence obviously does not warrant the inference of guilt that this court will interfere. Otherwise the weight of circumstancial evidence, and the inferences to be drawn from it, in almost every case, would finally be determined by the appellate court. We think a verdict of a jury based upon circumstantial evidence comes to us as any other verdict, and unless we can say that the inference of guilt drawn from the evidence is wholly unwarranted, we cannot interfere. Wainscott v. State, 8 Okla. Cr. 590, 129 Pac. 655.

This court has repeatedly held that all that is required of the appellate court in determining the sufficiency of the evidence to support a conviction is to find that

there is evidence in the record which forms a sufficient basis for the verdict of the jury. Whitten v. State, 25 Okla. Cr. 447, 221 Pac. 115; Pickett v. State, 35 Okla. Cr. 60, 248 Pac. 352; Spears v. State, 46 Okla. Cr. 278, 287 Pac. 1060; Singleton v. State, 48 Okla. Cr. 276, 291 Pac. 145.

No objection was made or exception taken to any of the instructions given by the court. Taken as a whole, the instructions correctly cover every phase of the case presented by the facts and circumstances in evidence.

There being no reversible error, the judgment of the lower court is affirmed.

EDWARDS, P. J., and DAVENPORT, J., concur.